Erika Birch (Bar No.7831)
Chad Johnson (Bar No. 10101)
**STRINDBERG & SCHOLNICK, LLC**
1516 W. Hays St.
BOISE, ID 83702
(t) 208.336.1788
(f) 208.344.7980
erika@idahojobjustice.com
chad@idahojobjustice.com

*Attorneys for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| **ROD CUTBIRTH**,<br><br>        Plaintiff,<br><br>vs.<br><br>**BOISE PROJECT BOARD OF CONTROL, a quasi governmental entity in the State of Idaho**,<br><br>        Defendant. | **COMPLAINT**<br>**(JURY DEMANDED)**<br><br><br>Civil No.<br><br>Judge |

Plaintiff Rod Cutbirth ("Mr. Cutbirth" or "Plaintiff") complains and alleges against Boise Project Board of Control ("Boise Project" or "Defendant") as follows:

### I.       NATURE OF CASE

1.       This suit is brought by a former employee of Defendant for damages due to a deprivation of rights secured by Section 504 of the Rehabilitation Act ("Rehab Act") of 1973, as amended, 29 U.S.C. § 701 et seq..

2.      Plaintiff seeks all available equitable relief, damages, attorneys' fees, costs, and interest.

## II.      PARTIES

3.      Plaintiff Rod Cutbirth, is an adult individual, competent to bring this action, a citizen of the State of Idaho, and a resident of Ada County, Boise, Idaho. He was an employee of Boise Project at all relevant times herein.

5.      Defendant Boise Project is the operating agent for five irrigation districts whose purpose is to manage the irrigation facilities and other works transferred by the United States Bureau of Reclamation to the irrigation districts and to deliver water to their landowners. Defendant Boise Project was created in 1926 by virtue of contracts entered into between these five irrigation districts and the United States.

## III.      JURISDICTION AND VENUE

6.      This Court has original jurisdiction under the provisions of 28 U.S.C. § 1331 with respect to Plaintiff's claims arising under federal law.

7.      Venue is proper with this Court as Defendant is a political subdivision of the State of Idaho within the jurisdiction of this Court, and the alleged illegal conduct occurred within the jurisdiction of this Court.

## IV.      GENERAL ALLEGATIONS

8.      Boise Project furnishes a full irrigation water supply to large amounts of land throughout Idaho and Oregon.

9.     Upon information and belief, Boise Project received federal financial assistance during all times relevant. This includes monies Boise Project is believed to receive from the United States Bureau of Reclamation as a federal contractor.

10.    Mr. Cutbirth began working for Boise Project in 1995. Throughout his tenure with Boise Project, Mr. Cutbirth worked as a gopher trapper, spray foreman, ditch rider, tractor operator, and fulfilled several other roles.

11.    Mr. Cutbirth always fulfilled his role dutifully, demonstrated a strong work ethic, and was a loyal employee of the company.

12.    In his most recent role, Mr. Cutbirth worked primarily as a tractor operator.

13.    As a tractor operator, Mr. Cutbirth had several duties, including but not limited to the following: Operating trucks and construction equipment, installing ditches and pipelines, loading trucks with a front-end loader, servicing Boise Project vehicles (daily preventative maintenance), maintaining vehicle records, observing and making needed corrections on vehicle safety, scheduling and coordinating vehicle maintenance and repair, keeping records on work accomplished, pushing and maneuvering heavy objects with carts, tree and bush trimming, assisting in spraying and mowing weeds, and occasionally performing basic office tasks (answering phone calls and other clerical duties).

14.    Unfortunately, on January 25, 2017, Mr. Cutbirth slipped on ice while loading pipe into a truck at work, severely injuring his neck, hip, and lower back. The fall caused such severe pain that he immediately reported his injury to the water master, Clint McCormick ("Mr. McCormick").

15.     After filling out a work accident report, Mr. Cutbirth went to the hospital where his doctor informed him that he suffered from a strain of muscle, fascia, and tendon on his neck; contusion in the left hip; and, a sprain of ligaments in his lumbar spine.

16.     Thereafter, Mr. Cutbirth began taking a few hours off of work as needed to go to physical therapy and to further recuperate from his injuries.

17.     On March 14, 2017, Dr. Montalbano, Mr. Cutbirth's doctor, scheduled back surgery for Mr. Cutbirth for April 20, 2017.

18.     Dr. Montalbano also permitted Mr. Cutbirth to return to work with certain work restrictions up until his surgery: 8-hour days, lumbar restrictions, no lifting greater than 20 pounds, and no repetitive stooping, bending, or twisting.

19.     Prior to surgery, Mr. Cutbirth submitted FMLA paperwork to Boise Project in order to protect his job while he was recuperating.

20.     Plaintiff had a successful surgery on April 20, 2017 and was on leave until the end of May 2017.

21.     On May 31, 2017, Dr. Montalbano opined that Mr. Cutbirth could once again return to work under certain restrictions: 4-hour work days, lumbar restrictions, no lifting greater than 20 pounds, and no repetitive stooping, bending, or twisting.

22.     Mr. Cutbirth promptly informed Boise Project of his workplace restrictions and was excited to get back to work.

23.     Indeed, Mr. Cutbirth's back was feeling great, and he presumed he would be back to work without restrictions shortly.

24.     There were many tasks that Mr. Cutbirth could still perform within his work restrictions. For example, he could still: operate the trucks (he drove his truck to work every day without problem) and other construction vehicles (only certain tasks and machines, like the mower and bulldozer – it depended on the task or machine); perform daily checks on vehicles and ensure vehicles were safe; perform basic vehicle maintenance; check canals for leaks and treat them for moss; close and open gates at road crossings; and all office related tasks.

25.     Despite this, upon his return to work, Mr. McCormick and Foreman Kevin Reeves ("Mr. Reeves") assigned him many tasks that were specifically against his restrictions.

26.     For example, in June 2017, Mr. McCormick and Mr. Reeves assigned Mr. Cutbirth a project requiring him to prepare some buildings for paint and primer by removing the paint off of the buildings.

27.     This project, which took more than a month, required him to reach high and bend low to remove old paint from the buildings aggravating his back.

28.     Then, after a windstorm blew the removed paint chips all over the parking lot, these supervisors demanded Mr. Cutbirth and two other employees pick up the paint chips requiring more stooping and bending.

29.     While Mr. Cutbirth's co-workers told to use an air compressor to blow the paint chips into a pile, Mr. Cutbirth's supervisors made him pick up the chips by hand. As a result of the continuous bending and stooping to the ground, a sharp pain began to run from Mr. Cutbirth's back down to his leg.

30.     During the second and third weeks of the project, Mr. Cutbirth's supervisors again assigned him to pick up paint chips in violation of his restrictions.

31.     Mr. Cutbirth was worried about approaching Boise Project about these assignments and the pain he was suffering for several reasons. First, Boise Project knew his restrictions were such that these assignments seemed purposeful, and Boise Project had recently terminated at least one other employee who had restrictions due to an injury. Thus, in order to preserve his job, Mr. Cutbirth continued to work despite the pain in his back.

32.     However, Mr. Cutbirth did make attempts to gain assignments within his restrictions.  For example, he asked Mr. McCormick if he could operate the truck as an alternative assignment. Mr. McCormick refused this request.

33.     On July 3, 2017, Mr. McCormick assigned Mr. Cutbirth to pull weeds, again requiring him to perform duties that violated his work restrictions and further exacerbated the pain in his back.

34.     During this same time period, Mr. Cutbirth knew of other tasks that physically healthy employees were doing, such as hauling materials to job sites, operating the truck, or using the bulldozer, which he could have performed within his medical restrictions.

35.     However, Mr. McCormick and Mr. Reeves refused to allow Mr. Cutbirth to work these jobs.

36.     On August 22, 2017, after completing one of his assignments, Mr. Cutbirth asked Mr. McCormick for additional work.

COMPLAINT AND DEMAND FOR JURY TRIAL - 6

37.     Mr. McCormick became uneasy with Mr. Cutbirth and told Mr. Cutbirth that they no longer had any more work for him to do at Boise Project and that he should talk with Tim Page ("Mr. Page"), Project Manager, about his employment status with the company.

38.     Later that day, Mr. Cutbirth questioned Mr. Page about the sudden and apparent change in his employment status. Mr. Page rebuked Mr. Cutbirth, proclaiming that he was a liability to the company due to his work restrictions, that they did not have any more work for him, and that they were not going to pay him to just sit around and answer the phone.

39.     Despite Mr. Page's demeaning and hostile attitude towards Mr. Cutbirth, Mr. Page declared that they would not be terminating his employment, at least for now.

40.     Mr. Page then added that Mr. Cutbirth should not come back to work until all of his work restrictions were removed. Accordingly, Mr. Cutbirth left work.

41.     On September 8, 2017, Mr. Cutbirth went to Boise Project to discuss an issue with a paycheck. While there, Mr. Page and Bob Carter, Project Manager, asked to meet with him.

42.     Without asking Mr. Cutbirth about his current health status or about his current work restrictions, Mr. Page and Mr. Carter swiftly terminated Mr. Cutbirth.

43.     The only explanations given to Mr. Cutbirth were that his FMLA had run out, that his reasonable accommodations were too burdensome and that Boise Project could no longer accommodate him.

44.     When Mr. Cutbirth tried to explain that it was taking longer for him to heal because Boise Project had violated his work restrictions, Mr. Page interrupted him and told him they were "not going there."

45.     Mr. Cutbirth, who had worked for Boise Project for over 20 years, got no sympathy and was merely told to collect his last paycheck and turn in his keys, which he dishearteningly did.

46.     The following month, Mr. Cutbirth had to have a second surgery on his back because he had not healed properly by working outside of his restrictions.

47.     In or about April of 2018 Mr. Cutbirth noticed that Boise Project had a job opening for his previous position.

48.     Soon thereafter, Mr. Cutbirth reapplied for the position at Boise Project.

49.     Mr. Cutbirth was not offered the position and in fact never heard anything back from Boise Project about his application.

## FIRST CAUSE OF ACTION
### (Failure to Engage in the Interactive Process
### in Violation of the Rehab Act)

50.     Plaintiff incorporates the allegations contained in the above paragraphs as if fully set forth herein.

51.     At all times relevant hereto, Plaintiff was disabled within the meaning of the Rehab Act, 29 U.S.C. § 705(20), because the physical impairments caused by his back injury substantially limited several major life functions, including restrictions on the lumbar, no lifting greater than 20 pounds, and no repetitive stooping, bending, or twisting.

52.     Notwithstanding his disability, Plaintiff was able to perform the essential functions of his position with reasonable accommodations, as shown by his successful job performance after he requested an accommodation on or about May 31, 2017.

53.     Defendant was fully aware of Plaintiff's disabilities and had accommodated him in the past and/or had the capacity to reasonably accommodate him through his recovery period.

54.     Without good reason, Defendant suddenly refused to allow Mr. Cutbirth to continue working and failed to engage in the interactive process with Plaintiff in good faith. Then, it determined unilaterally on September 8, 2017 that no accommodation would allow Plaintiff to perform his job and terminated him.

55.     Defendant's multiple failures to engage in the interactive process violates the Rehab Act, 29 U.S.C. § 794.

56.     As a result of these violations, Plaintiff is entitled to recover damages for lost back and future wages and benefits, plus prejudgment interest on those amounts.

57.     As a further proximate result of Defendant's discriminatory actions against Plaintiff, as alleged above, Plaintiff has been harmed in that he has suffered mental anguish, and emotional and physical distress, in an amount to be proven at trial.

58.     Plaintiff is also entitled to recover his attorneys' fees and costs expended in prosecuting this action and any other relief as provided under 29 U.S.C. § 794a.

## SECOND CAUSE OF ACTION
### (Failure to Provide Reasonable Accommodation
### in Violation of the Rehab Act)

59.     Plaintiff incorporates the allegations contained in the above paragraphs as if fully set forth herein.

60.     Defendant was fully aware of Plaintiff's disabilities and had accommodated him, in whole or in part, for many months.

61.     Defendant revoked these accommodations and refused to discuss alternative or additional accommodations.

62.     Instead, Defendant sent Plaintiff home and told him not to come back until he had no work restrictions.

63.     Defendant then terminated Plaintiff's employment on September 8, 2017.

64.     Defendant's pattern of failing to fully and reasonably accommodate Plaintiff ending in its final termination of Plaintiff's employment violated Rehab Act, 29 U.S.C. § 794.

65.     As a proximate result of Defendant's failure to reasonably accommodate Plaintiff, as alleged above, Plaintiff has been harmed in that he has suffered the loss of wages (both back and future), and benefits, in an amount to be proven at trial.

66.     As a further proximate result of Defendant's discriminatory actions against Plaintiff, as alleged above, Plaintiff has been harmed in that he has suffered mental anguish, and emotional and physical distress, in an amount to be proven at trial.

67.     Plaintiff is also entitled to recover his attorneys' fees and costs expended in prosecuting this action and any other relief as provided under 29 U.S.C. § 794a.

## THIRD CAUSE OF ACTION
### (Disability Discrimination in Violation of the Rehab Act)

68.     Plaintiff incorporates the allegations contained in the above paragraphs as if fully set forth herein.

69.     Rehab Act, 29 U.S.C. § 794 makes it unlawful for an employer to discriminate against an employee because of a disability.

70.     Defendant failed to abide by Plaintiff's work restrictions and assigned him duties in violation of his restrictions.

71.     Defendant also gave tasks to non-disabled employees after May 31, 2017 that Plaintiff could have performed within his restrictions (carrying loads, basic maintenance on vehicles, office tasks, etc.) instead of assigning him tasks against his restrictions, such as picking weeds.

72.     Further, Defendant berated Plaintiff specifically because of his disability telling him that he was a liability and would no longer be accommodated.

73.     Defendant then forced Plaintiff out on leave, without engaging in the interactive process and then terminated his employment because of his disability on September 8, 2017.

74.     Post termination, Defendant refused to consider rehiring Plaintiff despite his vast experience and long tenure with the company. In fact, Defendant made no inquiries into his ability to perform the essential functions of his position with or without a reasonable accommodation.

75.     As a proximate result of Defendant's discriminatory actions against Plaintiff, as alleged above, Plaintiff has been harmed in that he has suffered the loss of wages (both back and future), and benefits, in an amount to be proven at trial.

76.     As a further proximate result of Defendant's discriminatory actions against Plaintiff, as alleged above, Plaintiff has been harmed in that he has suffered mental anguish, and emotional and physical distress, in an amount to be proven at trial.

77.     Plaintiff is also entitled to recover his attorneys' fees and costs expended in prosecuting this action and any other relief as provided under 29 U.S.C. § 794a.

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment in his favor and against Defendants, and award the following relief:

a.     Back pay, in amounts to be determined at trial;

b.     Compensatory (emotional distress) and consequential damages;

c.     Front pay in lieu of reinstatement;

d.     Pre-judgment and post-judgment interest at the highest lawful rate;

e.     Attorneys' fees and costs of this action, including expert witness fees, as appropriate; and

f.     Any such relief as justice allows.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

Dated this 4th day of September, 2019.

**STRINDBERG & SCHOLNICK, LLC**

/s/ Erika Birch
Erika Birch
Chad Johnson
*Attorneys for Plaintiff*