UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ROD CUTBIRTH, an individual,<br><br>　　　　　　　Plaintiff,<br><br>v.<br><br>BOISE PROJECT BOARD OF CONTROL, a quasi-governmental entity in the State of Idaho,<br><br>　　　　　　　Defendant. | Case No. 1:19-cv-00341-CWD<br><br>**MEMORANDUM DECISION AND ORDER** |

## INTRODUCTION

The Rehabilitation Act of 1973, as amended, prohibits discrimination on the basis of disability in programs receiving federal financial assistance. 29 U.S.C. § 701 *et. seq.* As presented in the motion for summary judgment pending before the Court, the question the Court must decide in this employment discrimination case is what it means to "receive federal financial assistance."

Boise Project Board of Control (Boise Project), Rod Cutbirth's former employer, supplemented its regular operations with federal grant money, which subsidized specific projects occurring during time periods delineated by the terms of federal grant agreements. Cutbirth claims that he was subject to disability discrimination during a

**MEMORANDUM DECISION AND ORDER - 1**

period between the end date of one grant contract and the commencement of another, when Boise Project failed to accommodate his work restrictions and terminated his employment. Boise Project argues the Rehabilitation Act did not apply during this time period between grant projects, and that Boise Project's compliance with the anti-discrimination provisions in the Rehabilitation Act was shut off, much like water from a faucet.

Cutbirth also claims disability discrimination occurred when he applied for rehire into his former position several months after his employment was terminated. Boise Project does not dispute the Rehabilitation Act applied during that period, conceding that Boise Project was receiving federal financial assistance at the time Cutbirth's application for rehire was under consideration. Rather, Boise Project contends Cutbirth's rehire claim is unsupported by the complaint, and that the undisputed facts regarding Boise Project's failure to rehire Cutbirth support summary judgment dismissal of that claim.

Boise Project has moved for summary judgment on all of the claims of discrimination asserted by Cutbirth in his complaint. (Dkt. 1, 28.) The Court conducted a video hearing on the motion on February 16, 2021. Having carefully reviewed the record and applicable authorities, and for the reasons set forth below, the Court will deny the motion and allow all of Cutbirth's claims under the Rehabilitation Act to proceed.

## FACTS

1.   *Cutbirth's Employment*

Cutbirth was employed by Boise Project beginning in 1995. On or about January 25, 2017, Cutbirth suffered an injury when he slipped and fell while at work. Between the injury in January 2017 and surgery in April 2017, Cutbirth's doctor permitted him to work with certain restrictions. Boise Project accommodated these restrictions. Following surgery in April 2017, Cutbirth was on leave from work until on or about May 31, 2017. Cutbirth returned to work on or about June 7, 2017, when he was released to work by his physician with certain physical restrictions. On August 22, 2017, Boise Project placed Cutbirth on leave, and Cutbirth was told not to return to work until his work restrictions were removed. (Decl. of Cutbirth ¶ 7, Dkt. 33-2 at 2.) Further, Boise Project notified the State insurance Fund that it would not be rehiring Cutbirth, "unless he gets a full work release." (Dkt. 33-16 at 1.) Cutbirth's employment was terminated on September 8, 2017.

Cutbirth admits that his claims of discrimination under the Rehabilitation Act are not based on Boise Project's treatment of him prior to his return to work on June 7, 2017, although he claims his injury and resulting physical impairments triggered Boise Project's obligations to make accommodations for him when he was released to work. He alleges that, during the period between June 7, 2017, and the date of the termination of his employment on September 8, 2017, Boise Project did not provide sufficient accommodations, and that he was assigned tasks outside of his work related restrictions. (Decl. of Cutbirth ¶¶ 5-7, Dkt. 33-2 at 1-2.)

On or about April 26, 2018, Boise Project received an employment application for an open position submitted by Cutbirth for the same position he previously held. (*See* Decl. of Cutbirth ¶ 9.)  Upon receiving Cutbirth's application, Boise Project decided not to consider Cutbirth for the open position. Boise Project asserts that decision was based upon multiple write ups issued to Cutbirth for performance or conduct issues during his prior employment.

Cutbirth filed the complaint in this action on September 4, 2019.

**2.**     ***Boise Project Board of Control's Operations***

Boise Project, a quasi-municipal entity, is one participant with a defined role in a large system that stores, diverts, and delivers irrigation water to landowners in Southwest Idaho and Eastern Oregon. Boise Project is the operating agent for Big Bend Irrigation District, Boise-Kuna Irrigation District, New York Irrigation District, Wilder Irrigation District, and Nampa and Meridian Irrigation District (the "Irrigation Districts"). The irrigable lands served by this system of water delivery are divided into two divisions: the Arrowrock Division and the Payette Division. The Arrowrock Division includes lands irrigated by water stored in the Boise River and the Payette Division includes lands irrigated by water stored in the Payette River. On behalf of the Irrigation Districts, Boise Project operates that portion of the Arrowrock Division irrigated by the New York Canal and the Penitentiary Canal.

The irrigation infrastructure is owned either by the United States or by the Irrigation Districts. The Bureau of Reclamation built the dams, canals, and drainage systems. It holds legal title to the water rights for the storage projects. The United States

operates Arrowrock Dam, Anderson Ranch Dam and power plant, and Lucky Peak Dam, and some functions of the Diversion Dam and the power plant there are operated by the Bureau of Reclamation. The Irrigation Districts own the Arrowrock and Lucky Peak power plants, and hold equitable title to the water rights on behalf of the landowners who put the water to beneficial use.

Boise Project is responsible, on behalf of the Irrigation Districts, for operating and maintaining certain facilities, and canals and laterals, that are part of the larger irrigation system. Boise Project maintains over forty (40) miles of the New York Canal, which is the largest canal that Boise Project maintains, and approximately 1,500 miles of other canals and laterals, and delivers water to landowners on behalf of the Irrigation Districts. Boise Project also operates and maintains the Arrowrock Power Plant Project on behalf of the Irrigation Districts. (Dkt 33-4 at 2.)

The landowners pay assessments to the Irrigation Districts to cover the costs of operation and maintenance of the system for delivery of water, and these assessments principally fund Boise Project's operations. During the irrigation season, which runs from April through October, Boise Project performs maintenance work such as mowing, weed control, and treatment of chemicals in the canals. During the off-season, Boise Project completes more substantial repair and improvement projects to maintain or update the existing infrastructure. These improvement projects often are funded entirely by Boise Project out of its regular operational funds, which principally come from payment by the Irrigation Districts that are made based on the Irrigation Districts' assessments on landowners receiving irrigation water.

3.    *Grant Applications*

From time to time, Boise Project applies for WaterSMART Water and Efficiency Grants offered by the Bureau of Reclamation to defray project costs. If a WaterSMART Water and Efficiency Grant is awarded to Boise Project, it enters into an assistance agreement with the Bureau of Reclamation. Boise Project does not receive any federal funds unless and until it enters into an assistance agreement with the Bureau of Reclamation. Under WaterSMART Water and Efficiency Grants, the Bureau of Reclamation reimburses grant recipients for a certain percentage of reimbursable costs actually expended to complete the project for which the grant is awarded.

On or about January 20, 2016, Boise Project applied for a WaterSMART Water and Efficiency Grant under Funding Opportunity No. R16-FOA-DO-004 to replace 300 lineal feet of lining in the New York Canal. As part of its application, Boise Project signed and submitted the Federal government's "Standard Form 424D" assurances in which it certified it "[w]ill comply with all Federal statutes relating to non-discrimination… [including] but not limited to: … (c) Section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. §794, which prohibits discrimination on the basis of handicaps…" (Chase Decl. Ex. A, Dkt. 29-1 at 2.) On June 23, 2016, the Bureau of Reclamation notified Boise Project that it was being awarded a grant pursuant to Funding Opportunity No. R16-FOA-DO-004. (Dkt. 29-1 at 49.) The email indicated that the Bureau was reviewing Boise Project's "proposal, budget and budget narrative in more detail," and once that was complete, Boise Project would be contacted and advised about

any additional information required. (Dkt. 29-1 at 49.) The Bureau indicated it looked

"forward to working with [Boise Project] to complete this award." *Id.*

On or about September 7, 2016, representatives of Boise Project and the Bureau of

Reclamation executed an assistance agreement pertaining to the grant awarded pursuant

to Funding Opportunity No. R16-FOA-DO-004 (the "New York Canal Lining

Agreement"). (Dkt. 29-1 at 52.) The New York Canal Lining Agreement was effective

from September 7, 2016, through March 31, 2017. *Id.* (*See also* Grant Agreement at 6,

Dkt. 29-1 at 58.) The agreement specifically incorporated the assurances of standard form

424D that Boise Project signed in January 2016 into the contract and also separately

stated that, "the Recipient shall comply with … Section 504 of the Rehabilitation Act of

1973…." (Chase Decl., Ex. C, Dkt. 29-1 at 52, 91.) Despite the stated effective date,

pursuant to the terms of the Grant, work was to begin in August 2016, and completed in

March 2017. (Dkt. 29-1 at 59.)

The Bureau of Reclamation remitted to Boise Project a total of $97,594.51 in

satisfaction of its obligations under the New York Canal Lining Agreement. The Bureau

paid this amount in two transfers---the first on or about December 12, 2016, and the

second on or about February 16, 2017. Boise Project received no other money from the

Bureau related to the New York Canal Lining Agreement after February 16, 2017.

Cutbirth presented evidence that, after the payment on February 16, 2017, Boise

Project was still owed a balance of $5,893.49 on the New York Canal Lining project. On

April 17, 2017, Boise Project submitted a final progress report documenting physical

completion of that project. (Johnson Decl. Ex. 5, Dkt. 33-8.) On June 22, 2017, the

Bureau of Reclamation contacted Boise Project asking for final reports and stating it would begin the grant closeout process. The following day, Boise Project responded that it did not have any additional reports or expenses to submit for reimbursement. (Johnson Decl., Ex. 7, Dkt. 33-10.) Boise Project received an email reminder on September 5, 2017, from the Bureau stating it had an active contract, and on August 14, 2018, the Bureau of Reclamation closed out the grant for the New York Canal Lining project and deobligated the $5,893.49 that Boise Project did not use. (Johnson Decl. Ex. 10, Dkt. 33-13.)

On or about April 27, 2017, Boise Project applied for a WaterSMART Water and Efficiency Grant under Funding Opportunity No. BOR-DO-17-F011 to replace two existing manual check structures on the Deer Flat Low Line Canal, the Platt and Miller Check Structures, with solar powered, automated control gates. (Dkt. 29-2 at 6.) By letter dated July 20, 2017, which was received on July 21, 2017, the Bureau of Reclamation notified Boise Project that it was "now being considered for award of a financial assistance agreement" pursuant to Funding Opportunity No. BOR-DO-17-F011 (the "Platt/Miller Award Letter"). (Dkt. 29-2 at 21.)[1] On April 4, 2018, Boise Project executed an assistance agreement with the Bureau of Reclamation pertaining to the grant awarded pursuant to Funding Opportunity No. BOR-DO-17-F011 (the "Platt/Miller Agreement"). (Dkt. 29-2 at 24.) A representative of the Bureau of Reclamation executed the assistance

---

[1] The Platt/Miller Award Letter further stated that the letter "is not a final commitment of funding. A financial assistance agreement will not be executed and funds will not be awarded until further information about your project is developed and all statutory and regulatory requirements have been met…." (Dkt. 29-2 at 21.)

agreement on April 12, 2018, and by its terms, the Platt/Miller Agreement was effective from April 12, 2018, through June 30, 2018. *Id.* However, the grant agreement indicated that the scope of work outlined therein was to begin in October 2017, and completed in June 2018. (Dkt. 29-2 at 30-31.) The Bureau of Reclamation remitted to Boise Project a single payment in satisfaction of its obligations under the Platt/Miller grant on or about May 14, 2018.

On or about May 10, 2018, Boise Project applied for a WaterSMART Water and Efficiency Grant under Funding Opportunity No. BOR-DO-18-F006 to replace 1,600 lineal feet of lining in the New York Canal. By letter dated October 2, 2018, the Bureau of Reclamation notified Boise Project that it was not being awarded a grant pursuant to Funding Opportunity No. BOR-DO-18-F006.

Cutbirth's Complaint sets forth three causes of action under Section 504 of the Rehabilitation Act of 1973: (1) failure to engage in the interactive process; (2) failure to provide reasonable accommodations; and (3) disability discrimination, both during the period after Cutbirth returned to work on June 7, 2017, and in connection with Cutbirth's later application for rehire in April of 2018. For the period June 7, 2017, through September 8, 2017, the date of the termination of Cutbirth's employment, Boise Project asserts it was not a party to any grant agreement with the Bureau of Reclamation, did not receive any federal funds, and was not otherwise receiving federal financial assistance, such that the Rehabilitation Act does not apply. (Decl. of Chase ¶ 7, Dkt. 29.) Boise Project does not make the same assertion for the period in April and May of 2018, when Cutbirth's application for rehire was under consideration. Rather, Boise Project argues

the complaint fails to set forth sufficient facts to state a claim for discrimination, or alternatively, that the undisputed facts establish the decision not to rehire Cutbirth was not made on account of his disability.

## DISCUSSION

1.     **Legal Standards**

   A.     *Summary Judgment Standard*

Summary judgment is appropriate when the evidence, viewed in the light most favorable to the non-moving party, demonstrates "there is no genuine issue of any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Galen v. County of Los Angeles*, 477 F.3d 652, 658 (9th Cir. 2007). Evidence includes "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits...." *DeVries v. DeLaval, Inc*., 2006 WL 1582179, at *5 (D. Idaho June 1, 2006), report and recommendation adopted, 2006 WL 2325176 (D. Idaho Aug. 9, 2006). Conclusory, nonspecific statements in affidavits are not sufficient; and, the court will not presume "missing facts." *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888-89 (1990).

The moving party bears the initial burden to show no material fact is in dispute and a favorable judgment is due as a matter of law. *Celotex*, 477 U.S. at 323.  If the moving party meets this initial burden, the non-moving party must identify facts showing a genuine issue for trial to defeat the motion for summary judgment. *Cline v. Indus. Maint. Eng'g & Contracting Co*., 200 F.3d 1223, 1229 (9th Cir. 2000). The Court must

grant summary judgment if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

### B.    *The Rehabilitation Act*

To state a claim of employment discrimination under Section 504 of the Rehabilitation Act, a plaintiff must establish:

> (1) he is an individual with a disability; (2) he is otherwise qualified to receive the benefit; (3) he was denied the benefits of the program solely by reason of his disability; and (4) the program receives federal financial assistance.

*Duvall v. Cnty. of Kitsap*, 260 F.3d 1124, 1135 (9th Cir. 2001). The purpose underlying Section 504 is "to assure evenhanded treatment and the opportunity for handicapped individuals to participate in and benefit from programs receiving federal assistance." *Alexander v. Choate*, 469 U.S. 287, 304 (1985) (citing *Southeastern Community College v. Davis*, 442 U.S. 397 (1979)). The United States Supreme Court has held that, "[s]ection 504, by its terms, prohibits discrimination only by a 'program or activity receiving Federal financial assistance.'" *Consolidated Rail Corp. v. Darrone*, 465 U.S. 624, 635 (1984).

As a basis for its motion for summary judgment, Boise Project argues Cutbirth cannot prove the fourth element to establish his claims of discrimination between June 7, 2017, and September 8, 2017. Although receipt of federal financial assistance is an essential element of a cause of action under the Rehabilitation Act, s*ee* H.Rep. No. 485 (II), 101st Cong., 2d Sess. 84 (1990), *reprinted in* 1990 U.S.C.C.A.N. 267, 366, 1990 WL

121684, the term "financial assistance" is not defined in the Act. Courts have applied the

ordinary meaning of the term and have generally concluded that an entity receives

financial assistance when it receives a subsidy. *DeVargas v. Mason & Hanger-Silas*

*Mason Co.*, 911 F.2d 1377, 1382 (10th Cir. 1990) (citing *Jacobson v. Delta Airlines,*

*Inc.,* 742 F.2d 1202, 1208–09 (9th Cir. 1984), *cert. dismissed,* 471 U.S. 1062 (1985)).

The implementing regulations provide:

> (h) Federal financial assistance means any grant, loan,
> contract (other than a procurement contract or a contract of
> insurance or guaranty), or any other arrangement by which
> the Department provides or otherwise makes available
> assistance in the form of:
> > (1) Funds;
> > (2) Services of Federal personnel; or
> > (3) Real and personal property or any interest in or use
> of such property, including:
> > > (i) Transfers or leases of such property for less than
> fair market value or for reduced consideration; and
> > > (ii) Proceeds from a subsequent transfer or lease of
> such property if the Federal share of its fair market value is
> not returned to the Federal Government.

45 C.F.R. § 84.3

Under program-specific statutes such as Section 504, Congress enters into an

arrangement in the nature of a contract with the recipients of the federal funds, and it is

the recipient's acceptance of the funds that triggers coverage under the nondiscrimination

provision. *U.S. Dep't of Transp. v. Paralyzed Veterans of Am*., 477 U.S. 597, 605 (1986).

## C.   *The SECURE Water Act*

The SECURE Water Act of 2009[2] permanently established a grant program within the Bureau of Reclamation to focus on promoting water conservation and efficiency measures. 42 U.S.C. §§ 10361-10370. The statute authorizes the Bureau to make grants or agreements to help an "eligible applicant" plan, design, or build an "improvement" to conserve water, increase water use efficiency, or enhance water management. 42 U.S.C. § 10364. An "eligible applicant" must be a state, Indian tribe, or an entity that delivers water or power. 42 U.S.C. § 10362(7). No grant or agreement may exceed 5 million dollars, and the program is authorized to spend up to 200 million dollars over its lifetime. 42 U.S.C. § 10364(a)(3)(E)(iii), (e).

Pursuant to the Act, the Bureau of Reclamation provides funding opportunities each fiscal year through its WaterSMART Water and Energy Efficiency Grant program "that support water management organizations developing projects that result in quantifiable and sustained water savings, increase the production of hydropower and support broader water reliability benefits." Bureau of Reclamation, Water and Energy Efficiency Grants, https://www.usbr.gov/watersmart/weeg/ (last visited March 16, 2021).

---

[2] SECURE stands for "Science and Engineering to Comprehensively Understand and Responsibly Enhance." S. 2156, 110th Cong. § 1(a) (2007).

2.      **Analysis**

   A.      ***Application of the Rehabilitation Act During the Period Prior To Cutbirth's Termination from Employment***

The first question the Court must address is whether Boise Project "received federal financial assistance" within the meaning of the Rehabilitation Act during the period between June 7, 2017, and September 8, 2017, when Cutbirth alleges Boise Project did not accommodate his work restrictions and thereafter terminated his employment. If Boise Project did not receive federal financial assistance during this period, Boise Project asserts Cutbirth's claims under Section 504 claiming discrimination during that period fail as a matter of law.

Boise Project interprets the phrase narrowly, focusing upon the actual receipt of federal funds and the express term of the grant contracts, and claims there is no dispute federal funds were not received during the time period between the New York Canal Lining project grant and the Platt/Miller project grant. Conversely, Cutbirth interprets the phrase more broadly, focusing on the continual relationship between Boise Project and the federal government, and pointing also to Boise Project's work on behalf of the Irrigation Districts to "use and maintain" the Arrowrock Dam Power Plant, which is owned by the federal government.

   (1)      ***The Grant Applications***

Cutbirth's primary argument is that Boise Project is subject to the nondiscrimination provisions in the Rehabilitation Act, because the federal government has consistently extended federal financial assistance to Boise Project since at least 2016,

**MEMORANDUM DECISION AND ORDER - 14**

citing to the two grant applications submitted in 2016 and 2017. Cutbirth argues that, because Boise Project pledged in January of 2016 in its grant application for the New York Canal Lining project to abide by the Act, and did so again when it applied in April of 2017 for the Platt/Miller project grant, the Act covers the period of alleged discrimination between June 7, 2017, and September 8, 2017. Cutbirth argues also that certain activities, such as the deobligation of funds earmarked for the New York Canal Lining project which occurred after April 17, 2017, subjects Boise Project to the Act.

There is a dearth of case law interpreting what it means to "receive federal financial assistance" under the Rehabilitation Act in situations where an employer receives federal grant assistance. In the most analogous case, the United States Court of Appeals for the District of Columbia Circuit, in *Crandall v. Paralyzed Veterans of America*, 146 F.3d 894, 896 (D.C. Cir. 1998), considered when an employer became bound by the anti-discrimination provisions of the Act. There, the term of Paralyzed Veterans' federal grant did not begin until September 11, 1992, according to the funding agency's letter approving the grant. Plaintiff's employment was terminated one day prior, on September 10, 1992.

The plaintiff in *Crandall* argued that, because his employer pledged in its federal grant application to abide by federal rules and regulations, it was bound by Section 504 of the Rehabilitation Act before the grant was awarded. The court rejected the plaintiff's theory, observing that the letter approving the grant made the grant contingent on acceptance by Paralyzed Veterans of America, which did not occur until the grant agreement was executed on September 14, 1992. *Crandall*, 146 F.3d at 896. The court

**MEMORANDUM DECISION AND ORDER - 15**

held that Section 504 did not apply at the time of the alleged act of discrimination, because the formal start of the grant period and Paralyzed Veterans of America's contractual commitment came after the date of the plaintiff's dismissal. *Id. See also Bachman v. Am. Soc. of Clinical Pathologists*, 577 F. Supp. 1257, 1262 (D.N.J. 1983) (recipients of federal financial assistance are liable for violations of the Rehabilitation Act which occur during the time that they are recipients of federal financial assistance).

The United States District Court for the Southern District of Indiana applied *Crandall* in *Vanes v. Indiana Comm'n on Pub. Records*, No. 2:07-CV-00063 RLY-WGH, 2008 WL 763374, at *6 (S.D. Ind. Mar. 20, 2008). Similar to the facts in *Crandall*, the plaintiff's employment was terminated two months prior to his employer accepting the terms of a federal grant. The plaintiff argued his employer was a recipient of federal funds prior to that date by virtue of the employer's application for the grant. The court rejected that argument, finding the relevant inquiry was the date the employer agreed to accept the terms and conditions of the grant, including its antidiscrimination assurances. *Id.*

The court in *Vanes* held that, as a matter of law, the employer was not a recipient of federal financial assistance as a result of its grant application, because the employer did not agree to accept the terms and conditions of the grant until two months after the plaintiff's employment was terminated. *Id. See also Rivera-Flores v. Puerto Rico Tel. Co.*, 840 F. Supp. 3, 5 (D.P.R. 1993), judgment entered, (D.P.R. June 20, 1994), and vacated, 64 F.3d 742 (1st Cir. 1995) (rejecting application of the Rehabilitation Act if the employer had simply applied for Federal funding, holding: "To meet the definition of

'receiving Federal financial assistance' under the Rehabilitation Act, the employer must be qualified and approved for receipt of Federal financial assistance.").

But neither *Crandall*, *Vanes*, nor *Rivera-Flores* resolves the difficult question presented by the facts here. Boise Project did not simply apply for and receive a single grant, with an effective date after the termination of Cutbirth's employment. If the Platt/Miller project grant was the only grant Boise Project had ever applied for and accepted, *Crandall*, *Vanes*, and *Rivera-Flores* might provide persuasive authority for Boise Project's argument. But here, Boise Project participated in the WaterSMART Water and Energy Efficiency Grant program administered by the Bureau of Reclamation, and regularly applied for grants to subsidize its operations through the same, both immediately prior to and after the September 7, 2017 termination of Cutbirth's employment.

Notably, Cutbirth was employed during the grant period applicable to the New York Canal Lining project when he was injured on the job. And, although the New York Canal Lining project was completed before the March 31, 2017 contract termination date, and $5,893.49 of the total funds awarded with that grant were not claimed by Boise Project due to cost savings realized during construction, the Bureau of Reclamation considered the contract to be "active" as late as September 5, 2017. In fact, the remaining funds were not deobligated until August 14, 2018. By then, Boise Project had applied on April 27, 2017, for its next grant to subsidize the Platt/Miller project. In other words, Boise Project engaged in a continuing cycle of applying for, receiving, and subsidizing its activities with federal funds, and participated in the WaterSMART grant program

**MEMORANDUM DECISION AND ORDER - 17**

administered by the Bureau of Reclamation during the time periods relevant to all of the discrimination claims Cutbirth raises in his Complaint.

Under Boise Project's rigid, contract-based interpretation of what it means to receive federal financial assistance, compliance with the anti-discrimination provisions of the Rehabilitation Act could be shut off, so to speak, on the termination date printed on the grant agreement, and turned on again on the date the next grant agreement commenced. Boise Project relies upon authority characterizing legislation enacted pursuant to Congress' spending power, such as the Rehabilitation Act, "in the nature of a contract: in return for federal funds, the States [or others] agree to comply with federally imposed conditions. The legitimacy of Congress' power to legislate under the spending power thus rests on whether the State [or other entity] voluntarily and knowingly accepts the terms of the 'contract.'" *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). *See also State of Nev. v. Skinner*, 884 F.2d 445, 447 (9th Cir. 1989) (recognizing Congress can condition receipt of funds by states or other entities on compliance with federal directives). Nonetheless, the Court respectfully disagrees with this strict interpretation by Boise Project under the facts of this case.

Boise Project's interpretation would allow grant recipients like Boise Project, which continually applies for and receives federal funds to subsidize its operations, to claim exemption from the anti-discrimination provisions in the Rehabilitation Act during periods of time falling between the contractual termination date of one grant and the commencement date of the next. But in this case, the undisputed facts establish federal funds were still earmarked for the New York Canal Lining project at the time the alleged

discrimination occurred, and that Boise Project had also applied for, and was awaiting the award of, another grant during the same short period of time between the precise grant performance dates in the assistance agreements. Cutbirth also was employed and injured during the grant period for the New York Canal Lining project. The Court therefore rejects the "bright line" test proposed by Boise Project for determining when an employer receives federal financial assistance which in turn invokes application of Section 504 of the Rehabilitation Act. *See, e.g., Brown v. Sibley*, 650 F.2d 760, 770 (5th Cir.1981) (holding that a Section 504 claim was not cognizable unless "funds had been flowing to [the] project at the time the discrimination alleged in [the] case was perpetrated").

Under the unique facts before it, the Court finds, as a matter of law, that Boise Project was receiving federal financial assistance within the meaning of Section 504 of the Rehabilitation Act between June 7, 2017, and September 8, 2017. Therefore, Cutbirth has established the fourth element of his Rehabilitation Act claims based on that period of time.

### (2)  *Right to Use and Occupy Federal Property*

Cutbirth's alternative argument for application of the Rehabilitation Act is based upon Boise Project's alleged right to use and occupy land owned by the Bureau of

Reclamation to operate and maintain the Arrowrock Hydroelectric Plant. Because of the Court's holding above, the Court does not reach this alternative argument.[3]

### B.     Cutbirth's Discrimination Claim

Cutbirth asserts that count three of the Complaint sets forth a claim for discrimination related to his application for employment in April of 2018. Boise Project asserts two arguments in support of its motion for summary judgment dismissal of this claim. First, Boise Project argues Cutbirth has not alleged a discriminatory act in connection with Cutbirth's application for rehire, and that he should not be granted leave to amend his complaint. Second, Boise Project claims Cutbirth has not adequately alleged that Boise Project refused to rehire him because of a disability, asserting that it chose not to rehire him due to performance issues during his prior employment. As noted above, Boise Project does not dispute that the Rehabilitation Act applies to the period during which Cutbirth's application for rehire was under consideration.

The Court finds Cutbirth plausibly alleges a claim for disability discrimination in connection with his request for reemployment. The Complaint sets forth that Cutbirth's employment was terminated on September 8, 2017, after a 20-year employment history with Boise Project. When an opening was advertised for his previous position in April of

---

[3] The only mention of "Boise Project" in the Arrowrock Hydroelectric Plant contract is a cover sheet titled, "Record of Execution of Contract." (Dkt. 33-20 at 1.) But the contract document pertaining to the Arrowrock Hydroelectric Plant expressly states the contract is between the United States and the five irrigation districts, and it is signed by representatives of each district. Cutbirth presents no evidence that Boise Project, the Defendant in this case, can be equated with the Irrigation Districts. Boise Project represents it is a separate entity. (*See* Decl. of Carter ¶¶ 2-10, Dkt. 28-3.)  *See, e.g., Gallagher v. Croghan Colonial Bank,* 89 F.3d 275, 278 (6th Cir. 1996) ("coverage of the Rehabilitation Act does not follow federal aid past the intended recipient to those who merely derive a benefit from the aid or receive compensation for services rendered pursuant to a contractual arrangement.").

2018, he applied but never heard from Boise Project concerning that application. Boise Project knew of his work injury and physical work restrictions prior to the termination of his employment on September 8, 2017. Paragraphs 73 and 74 of the Complaint allege Boise Project terminated Cutbirth's employment because of his disability; refused to consider rehiring him despite his experience and tenure with the company; and, did not inquire about his ability to perform the essential functions of the position with or without a reasonable accommodation. Cutbirth states in his declaration that no one contacted him about the status of his work restrictions. (Decl. of Cutbirth ¶ 9 – 10, Dkt 33-2 at 2.) And, there is evidence in the record that Boise Project informed the State Insurance Fund it "would not be rehiring [Cutbirth] unless he gets a full work release."

Boise Project's second, or alternative, argument fares no better. Boise Project contends it chose not to consider Cutbirth's application for rehire because he had been written up multiple times during his prior employment, and several employees of Boise Project had expressed they were afraid of him and feared working with him. However, Cutbirth astutely points out that warning notices regarding certain traffic accidents and his "attitude" occurred in 2014 and 2015, remote in time to his work injury and the termination of his employment. (Decl. of Carter Exs. B – G, Dkt. 28-3.) Although a fourth warning occurred on June 14, 2016, wherein it was noted Cutbirth used "foul language" during his performance evaluation, later performance reviews noted Cutbirth's attitude had improved, and he met all performance expectations. (*Id.* Exs. B, G.) Cutbirth's last performance review covering the period of December 15, 2016, to June 5,

2017, indicated he met expectations in all areas, including in the areas of teamwork and cooperation, productivity, and communication skills. (*Id.* Ex. B.)

The Court finds Cutbirth has presented sufficient evidence to create material issues of fact as to whether Boise Project's failure to rehire Cutbirth constituted disability discrimination. Accordingly, the Court will deny Boise Project's motion for summary judgment as to this claim.[4]

## CONCLUSION

For the foregoing reasons, the Court will deny Boise Project's motion for summary judgment. The Court finds that, under the unique and undisputed factual circumstances here, Boise Project received federal financial assistance within the meaning of the Rehabilitation Act during all time periods, including between June 7, 2017, and September 8, 2017, relevant to Cutbirth's claims of disability discrimination. Additionally, the record contains sufficient evidence for a reasonable jury to conclude that Boise Project's decisions in connection with Cutbirth's application for rehire run afoul of the Rehabilitation Act's anti-discrimination provisions.

---

[4] Boise Project's argument strays beyond the limits of the Court's order allowing a preliminary motion for summary judgment in this case to determine the applicability of the Rehabilitation Act to the parties' claims and defenses. (Dkt. 15.) Accordingly, the Court will not provide a second opportunity for Boise Project to file a motion for summary judgment on the merits of Cutbirth's failure to rehire claim.

**MEMORANDUM DECISION AND ORDER - 22**

## ORDER

**NOW THEREFORE IT IS HEREBY ORDERED:**

1)      Defendant's Motion for Summary Judgment (Dkt. 28) is **DENIED.**

2)      The parties are to meet and confer, and submit a revised litigation and discovery plan on or before **March 31, 2021**, concerning further discovery. The Court will schedule a telephonic conference with the parties to discuss the same.

DATED: March 16, 2021

Honorable Candy W. Dale
United States Magistrate Judge